UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LENARD R. MATTHEWS, SR.,<br><br>Plaintiff,<br><br>v.<br><br>AMTRAK NATIONAL RAILROAD PASSENGER CORPORATION; and DOES 1 through 25, inclusive,<br><br>Defendant. | No. 2:16-cv-00959-TLN-EFB<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

This matter is before the Court pursuant to Defendant Amtrak National Railroad Passenger Corporation's ("Defendant") Motion for Summary Judgment or, alternatively, Partial Summary Judgment. (ECF No. 27.) Plaintiff Lenard Matthews ("Plaintiff") opposes Defendant's motion. (ECF No. 28.) Defendant filed a reply. (ECF No. 31.) The Court has carefully considered the arguments raised by both parties. For the reasons set forth below, Defendant's Motion for Summary Judgment or, alternatively, Partial Summary Judgment, is DENIED.

///
///
///
///
///

1

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

   A. <u>Plaintiff Takes Two Leaves of Absence for Medical Reasons</u>

Plaintiff, a former employee of Defendant's, suffers from renal disease, which substantially limits his renal functions in a manner sufficient to support life. (ECF No. 28-1 ¶¶ 176–78; ECF No. 28-12 ¶¶ 1–4; ECF No. 28-4 ¶¶ 3–4; ECF No. 28-13 ¶¶ 7–13.)

At all times during his employment with Defendant, Plaintiff was a member of the Transportation Communications Union. (ECF No. 28-1 ¶ 1.) As a member of the Transportation Communications Union, the hours, compensation, and working conditions of Plaintiff's employment were governed by the collective bargaining agreement ("CBA") between Defendant and the Union. (ECF No. 28-6 at 2.) In about 2011, Plaintiff applied for and was elevated to the position of Relief Lead Clerk at Defendant's Stockton station. (ECF No. 28-1 ¶ 2.) As a Relief Lead Clerk, Plaintiff's job duties included selling tickets, assisting passengers with their baggage, and setting the priorities of the other clerks working on the shift when he was the lead. (ECF No. 28-1 ¶ 3.)

Plaintiff requested and was granted two leaves of absence for medical reasons during his employment with Defendant. (ECF No. 28-1 ¶ 7.) Plaintiff's first leave of absence was in about 1995/1996 and lasted about nine (9) months. (ECF No. 28-1 ¶ 8.) In August 2013, Plaintiff requested, and Defendant granted, a second leave of absence for an issue with his kidney. (ECF No. 28-1 ¶ 10.) While Plaintiff's leave was initially granted through October 6, 2013, Defendant granted Plaintiff's requests to extend the leave through December 2, 2013. (ECF No. 28-1 ¶ 11.) During his second leave of absence, Plaintiff had a catheter inserted in his abdomen that allowed him to receive peritoneal dialysis. (ECF No. 28-1 ¶ 14.) Defendant was made aware of this through Plaintiff's Medical Status Report, in which Plaintiff's treating physician noted that Plaintiff had a peritoneal dialysis catheter inserted on August 9, 2013. (ECF No. 27-10 at 1.) Defendant was also in possession of Plaintiff's Supplemental Physician's Statement of Disability, which stated that Plaintiff had acute and chronic renal failure and was on chronic peritoneal home dialysis. (ECF No. 27-14 at 1.)

Because Plaintiff's second leave lasted more than thirty days, he was required to take a

return to duty physical and drug test before he was allowed to return to active service. (ECF No. 28-1 ¶ 15.) Plaintiff took the return to duty test between December 2, 2013, and December 9, 2013. (ECF No. 28-1 ¶ 16.) Plaintiff failed the return to duty test because the test showed he had cocaine metabolites in his system. (ECF No. 28-1 ¶ 17.)

Plaintiff does not dispute that his return to duty test accurately showed he had cocaine metabolites in his system. (ECF No. 28-1 ¶ 18.) Plaintiff was given two options as a result of his testing positive for cocaine: (1) he could contest the test results by proceeding to an investigation hearing, in accordance with the procedures in his CBA; or (2) he could sign a voluntary waiver of his rights to contest the test results and enroll in a drug rehabilitation program. (ECF No. 28-1 ¶ 19.) Plaintiff elected to enroll in the voluntary drug rehabilitation program rather than contest the return to duty test results. (ECF No. 28-1 ¶ 21.)

B. Plaintiff Signs Alcohol and Drug Waiver Agreement

Plaintiff executed Defendant's Alcohol and Drug Waiver Agreement ("Waiver Agreement") as part of his enrolling in the drug rehabilitation program. (ECF No. 28-1 ¶ 22.) The Waiver Agreement stated that Plaintiff must submit to and pass an unannounced drug and/or alcohol test by urine and/or breath sample at least four times a year for the first two years of active service following his return to duty. (ECF No. 28-1 ¶ 23.) The Waiver Agreement also stated that Plaintiff understood that if at any time in the future he violated Defendant's Alcohol and Drug Policy, he would be dismissed from all Amtrak service. (ECF No. 28-1 ¶ 23.) Plaintiff understood his employment would be terminated if he did not comply with the terms of the Waiver Agreement. (ECF No. 28-1 ¶ 24.)

Plaintiff satisfied the initial requirements of his Waiver Agreement by about February 2014. (ECF No. 28-1 ¶ 25.) After Plaintiff satisfied the initial requirements of his Waiver Agreement, he was required to take and pass a return to work evaluation. (ECF No. 28-1 ¶ 26.) Plaintiff was given and passed a urine and breath test as part of his return to work evaluation and was returned to active service in February 2014. (ECF No. 28-1 ¶ 28.) Although he needed to combine his work breaks so that he could have a one-hour break between 2:00 p.m. and 3:00 p.m. to attend to his peritoneal dialysis treatments, Plaintiff was able to perform the essential functions

of his job after his rest breaks and meal period accommodation was granted.  (ECF No. 28 at 20; ECF No 27-1 at 22–25.)

### C. Plaintiff Passes July 2014 Shy Bladder Exam

Plaintiff had a random drug test conducted as part of his Waiver Agreement in July 2014.  (ECF No. 28-1 ¶ 29.)  During this July 2014 random drug test Plaintiff could not provide a urine sample.  (ECF No. 28-1 ¶ 30.)  Because Plaintiff did not provide a urine sample, Defendant sent Plaintiff to see Dr. David Jourgensen for a shy bladder examination.[1]  (ECF No. 28-1 ¶ 31.)

Dr. Jourgensen's examination included visually inspecting Plaintiff's peritoneal dialysis catheter and drawing Plaintiff's blood to test the levels of creatinine in Plaintiff's system.  (ECF No. 28-1 ¶ 35.)  Based on his evaluation, Dr. Jourgensen determined that Plaintiff likely had a medical condition that has, or with a high probability could have, precluded him from providing a urine sample during his July 2014 random drug test.  (ECF No. 28-1 ¶ 36.)

### D. Plaintiff Fails October 2014 Shy Bladder Exam

Plaintiff had another random drug test in about October 2014.  (ECF No. 28-1 ¶ 39.)  Plaintiff was again not able to provide a urine sample during this October 2014 test.  (ECF No. 28-1 ¶ 40.)  Defendant referred Plaintiff to Dr. Steven Friend to perform another shy bladder examination after he failed to provide a urine sample during his October 2014 random drug test.  (ECF No. 28-1 ¶¶ 41, 42.)

The parties agree that Plaintiff was directed to fill out intake paperwork on arrival and the nurse performed standard intake examinations, i.e. testing blood pressure, color blindness, etc.  (ECF No. 28-1 ¶ 44.)  The parties also seem to agree that Plaintiff asked Dr. Friend what the examination of his abdomen would entail and allegedly stated he needed to take precautions such as having a mask and gloves and a clean atmosphere because of his catheter.  (ECF No. 28-1 ¶ 45.)

However, many of the events that occurred in the examination room are in dispute.  According to his declaration, Plaintiff was concerned about reinfection, due to his history of

---

[1] A shy bladder examination is conducted to determine whether a medical condition has, or with a high probability could have, precluded an individual from providing a urine sample during a prior drug test.  (ECF No. 28-1 ¶ 32.)

4

peritonitis, if Dr. Friend did not follow certain sterilization procedures during Plaintiff's exam. (ECF No. 28-1 ¶ 226; ECF No. 28-4 ¶¶ 23–26.) Plaintiff also stated that he showed his catheter to Dr. Friend and told Dr. Friend that his regular doctor informed him that the catheter should be handled with gloves and mask on. (ECF No. 28-1 ¶ 228; ECF No. 28-4 ¶ 26.) Plaintiff stated at this point, Dr. Friend terminated the exam by saying "I don't have to put up with this . . . ." (ECF No. 28-1 ¶ 229; ECF No. 28-4 ¶ 26.) Plaintiff alleges that he immediately called his supervisor, James Holland ("Holland"), and asked Holland to speak to the doctor, which Holland refused to do. (ECF No. 1 ¶ 20.) Plaintiff stated in his deposition that he would have completed the shy bladder exam if Holland had called Dr. Friend. (ECF No. 28 at 12; ECF No. 28-1 ¶ 235; ECF No. 28-4 ¶ 27; ECF No. 27-4 at 106–07.) Plaintiff further alleges that on or about October 16, 2014, he asked his supervisor, Holland, if he could take a blood test to confirm that there were no drugs in his system, but his request was denied. (ECF No. 28-4 at 5–6.)

In contrast, Dr. Friend, in his deposition, stated that Plaintiff never showed him his catheter, or informed him about his peritoneal dialysis or end stage renal disease. (ECF No. 27-6 at 8.) In his declaration, Holland did not mention Plaintiff asking for a blood test. (*See* ECF No. 27-33.)

### E. Defendant Terminates Plaintiff

On November 4, 2014, Defendant sent Plaintiff a letter stating that Plaintiff refused to be tested on October 16, a test required under the conditions of Plaintiff's Waiver Agreement. (ECF No. 1 ¶ 22; ECF No. 27-21 at 1.) It is undisputed that Defendant terminated Plaintiff's employment the same day. (ECF No. 28-1 ¶ 49.) After his employment was terminated, Plaintiff complained to the head representative for his Union, Jack Dinsdale, and contested his termination through the Union grievance procedures. (ECF No. 28-1 ¶ 50.) Plaintiff told Dinsdale that Defendant terminated his employment because it found he refused to take the required test, but he disputed this finding. (ECF No. 28-1 ¶ 51.) The Union acted on Plaintiff's request to contest Defendant's termination decision and appealed the decision. (ECF No. 28-1 ¶ 52.) Following the Union's appeal of Defendant's decision to terminate his employment, the termination was upheld. (ECF No. 28-1 ¶ 53.)

5

Plaintiff initiated this lawsuit on May 5, 2016. (ECF No. 1.)

## II. STANDARD OF LAW

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

### III. ANALYSIS

Plaintiff's complaint states five causes of action against Defendant: (1) unlawful discrimination under the Americans with Disabilities Act ("ADA"), 42 § 12101; (2) failure to accommodate in violation of ADA; (3) unlawful discrimination under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code. § 12900 et seq.; (4) failure to accommodate under FEHA; and (5) wrongful termination in violation of public policy. (*See* ECF No. 1.)

Defendant argues that summary judgment, or alternatively, partial summary judgment, is appropriate as to all five claims. (*See* ECF No. 27.) Defendant bases its argument on three grounds: (1) Plaintiff's claims against Defendant are preempted by the Railway Labor Act ("RLA"); (2) Plaintiff cannot establish the essential elements of his first, second, third, or fourth

claims for disability discrimination and/or failure to accommodate under ADA or FEHA; and (3) Plaintiff cannot establish the essential elements of his fifth cause of action for wrongful termination in violation of public policy. (*See* ECF No. 27-1 at 16–26.)

A. Preemption

Defendant argues that Plaintiff's claims are preempted by the RLA because resolving the claims requires interpretation or application of the CBA covering Plaintiff's employment. (*See* ECF No. 27-1 at 10.) Plaintiff argues in opposition to Defendant's motion that the proper RLA preemption analysis mandates that the Court deny Defendant's motion. (ECF No. 28 at 14.)

      *i.*      *Major Versus Minor Disputes*

Disputes between Defendant and its employees are governed by the RLA. 45 U.S.C. § 151. Congress enacted the RLA to "promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994); *see also* 45 U.S.C.A. § 151(a) (1996). RLA provides "a mandatory arbitral mechanism for 'minor' [and major] disputes." *Hawaiian Airlines*, 512 U.S. at 252. Major disputes relate to "the formation of collective bargaining agreements or efforts to secure them." *Felt v. Atchison, Topeka & Santa Fe Ry. Co.*, 60 F.3d 1416, 1419 (9th Cir. 1995). In contrast, minor disputes "involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Hawaiian Airlines*, 512 U.S. at 252. "Major" disputes are subject to federal court jurisdiction, whereas "minor" disputes must be resolved through an arbitral mechanism provided in the RLA, with very limited judicial review. *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302–04 (1989); *Ass'n of Flight Attendants v. Mesa Air Grp., Inc.*, 567 F.3d 1043, 1047 (9th Cir. 2009). Thus, a determination that a plaintiff's complaints constitute a minor dispute would preempt actions brought under state laws. *Hawaiian Airlines*, 512 U.S. at 253.

After *Hawaiian Airlines*, the scope of RLA preemption has been substantially narrowed. *Espinal v. Nw. Airlines*, 90 F.3d 1452, 1456 (9th Cir. 1996) (citing *Felt*, 60 F.3d at 1420). The Ninth Circuit has stated that the purpose of RLA minor dispute preemption is to reduce commercial disruption by facilitating collective bargaining, not to reduce burdens on an employer

by federalizing all of labor and employment law so as to preempt independent state rights. *Alaska Airlines, Inc. v. Schurke*, 898 F.3d 904, 920 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1445 (2019). Thus, courts have held that the characterization of a dispute as minor often depends on particularized facts. *Saridakis v. United Airlines*, 166 F.3d 1272, 1276 (9th Cir. 1999).

The main difference between major and minor disputes is that "[m]inor disputes . . . seek to enforce contractual rights . . . [and] 'may be conclusively resolved by interpreting the existing CBA.'" *Hawaiian Airlines*, 512 U.S. at 248, 256 (quoting *Conrail v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 300 (1989)); *see also Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 411 (1988) (finding that a dispute is minor only if it requires an "interpretation of [the] collective bargaining agreement"). A minor dispute "does not involve rights that exist independent of the CBA." *Hawaiian Airlines*, 512 U.S. at 265. Ninth Circuit cases have affirmed that "a minor dispute cannot involve rights that emanate from sources outside the agreement." *Sardakis*, 166 F.3d at 1276 (quoting *Felt*, 60 F.3d at 1419). Furthermore, if the issue to be decided in an action is a purely factual question, then it is not preempted by the RLA. *Hawaiian Airlines*, 512 U.S. at 261–62.

### ii. Alaska Airlines Test

In *Alaska Airlines*, the court affirmed a two-part test for determining whether a state law claim is preempted by the RLA.[2] First, the court must evaluate the "legal character" of the claim by asking whether it seeks to vindicate a right or duty created by a CBA — *i.e.* whether the claim is grounded in a CBA. *Alaska Airlines*, 898 F.3d at 921 (citing *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994)). "If a claim arises entirely from a CBA, . . . it is, in effect, a CBA dispute in state law garb, and is preempted" by the RLA. *Alaska Airlines*, 898 F.3d at 921 (citing *Livadas*, 512 U.S. at 122–23).

Second, if a right is not grounded in a CBA, a court must ask whether litigating the state law claim nonetheless requires interpretation of a CBA. *Hawaiian Airlines*, 512 U.S. at 262; *Livadas*, 512 U.S. at 124–25; *Alaska Airlines*, 898 F.3d at 921. At this second step of a RLA

---

[2] The same test applies to Labor Management Relations Act (LMRA) § 301 preemption. *Alaska Airlines Inc.*, 898 F.3d at 913–14; *Espinal v. Nw. Airlines*, 90 F.3d 1452, 1456 ("To determine whether the claim is preempted by the RLA, courts should apply the preemption test used in cases under the LMRA.").

9

preemption analysis, claims are only preempted when there is an active dispute over "the meaning of contract terms." *Alaska Airlines*, 898 F.3d at 921 (citing *Livadas*, 512 U.S. at 124). A hypothetical connection between the claim and the terms of the CBA is not enough to preempt the claim, nor is it enough that resolving the state law claim requires a court to refer to the CBA and apply its plain or undisputed language. *Alaska Airlines*, 898 F.3d at 921. Thus, the result of preemption at the second step is generally not the extinguishment of the state law claim. *Id.* at 922. Instead, the state law claim is preempted by the RLA "only insofar as resolution of the state-law claim requires the interpretation of a [CBA]." *Lingle*, 486 U.S. at 409, n.8; *see also Livadas*, 512 U.S. at 124 n.18.

### iii. *Plaintiff's FEHA Claims Are Not Preempted*

The application of this two-part test to Plaintiff's FEHA claims is straightforward. First, Plaintiff's FEHA claims do not arise entirely from the CBA. The Ninth Circuit has held that rights created by anti-discrimination statutes such as FEHA are independent of a CBA and thus claims brought pursuant to these acts are not minor disputes. *See Saridakis*, 166 F.3d at 1276–77 (finding that plaintiff's ADA and FEHA claims were not preempted by RLA where plaintiff failed a drug test pursuant to the collective bargaining agreement between United and the union); *Espinal*, 90 F.3d at 1456–58 (determining that RLA did not preempt claim under the FEHA); *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514 (9th Cir. 1995) (holding that FEHA claim for disability discrimination in employment was independent and not preempted); *Ackerman v. W. Elec. Co.*, 860 F.2d 1514, 1517 (9th Cir. 1988) (same); *see also Alaska Airlines*, 898 F.3d at 919–20 ("[P]rohibiting discrimination in employment . . . remains well within the traditional police power of the states . . . ."). Furthermore, Plaintiff's FEHA claims are not preempted because they invoke a state law right that applies to all workers, whether CBA-covered or not, and give rise to a state law dispute, not a dispute concerning the meaning of the CBA. *See Alaska Airlines*, 898 F.3d at 927 (finding that plaintiff's claim under Washington Family Care Act was not preempted: "what matters here is not the legal merits of Masserant's state law claim, but that Masserant's claim invokes a state law right that applies to all workers, whether CBA-covered or not, and gives rise to a state law dispute, not a dispute concerning the meaning of the CBA.").

Moreover, Plaintiff's FEHA claims do not meet the second prong of the preemption test because litigating the FEHA claims does not require interpretation of a CBA. *See Espinal*, 90 F.3d at 1457 (finding that discrimination claims under FEHA were not preempted under RLA where CBA did not provide a framework for challenging physical fitness requirement determinations, nor a mechanism to accommodate disabled workers); *see also Jimeno*, 66 F.3d at 1522–28 (finding FEHA claim not preempted where the CBA was silent as to how it would address claims of disability discrimination or accommodate disabled employees).

Defendant argues that Plaintiff's claims are preempted because the CBA determined the terms and conditions of Plaintiff's employment, drug testing protocol, and compensation. (ECF No. 27-1 at 18–21; *see also* ECF No. 27-33 at 8–19; ECF No. 27-22; ECF No. 27-23; ECF No. 27-24; ECF No. 28-6; ECF No. 28-7; ECF No. 28-8; ECF No. 28-9.) However, even if resolving the FEHA claim requires the Court to refer to the CBA, this is not enough to preempt the FEHA claim. *Alaska Airlines*, 898 F.3d at 921; *see also Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000) (holding that "interpretation" is "something more than 'consider,' 'refer to,' or 'apply'"). Therefore, Plaintiff's FEHA claims are not preempted.

       *iv.* *Plaintiff's ADA and Wrongful Termination Claims Are Not Preempted*

Similarly, Plaintiff's ADA claims are not preempted. The Ninth Circuit has held that ADA rights are independent of CBAs, even where a CBA contains an anti-discrimination clause and provides for a dispute mechanism. *Saridakis*, 166 F.3d at 1277. Because an ADA claim depends on the application of ADA standards and not the application of CBA standards, a dispute under the ADA is not minor and not preempted by the RLA. *Id*.

Likewise, the court in *Saridakis* held that wrongful discharge claims based on public policy violations are not preempted by federal labor laws because such claims are derived from sources outside the CBA. *Id.* at 1278 (citing *Paige v. Henry J. Kaiser Co.*, 826 F.2d 857, 862 (9th Cir. 1987); *Harper v. San Diego Transit Corp.*, 764 F.2d 663, 668 (9th Cir. 1985)). Although Plaintiff could contest his termination under both the CBA and state law, this does not render his wrongful discharge claim dependent. *See Hawaiian Airlines*, 512 U.S. at 261; *Saridakis*, 166 F.3d at 1278. "Under California law, his allegations give rise to a right separate,

distinct, and independent of the CBA." *Saridakis*, 166 F.3d at 1278. Thus, Plaintiff's wrongful discharge claim is not preempted by the RLA. *Id.*

      B.  <u>Unlawful Discrimination</u>

Plaintiff, in his first claim, alleges Defendant engaged in unlawful discrimination under the ADA. (ECF No. 1 at 6.) In his fourth claim, Plaintiff alleges unlawful discrimination under FEHA by Defendant. (ECF No. 1 at 8.) "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying [California] statutes." *Guz v. Bechtel Nat., Inc.*, 24 Cal. 4th 317, 354 (2000). The Court will therefore analyze Plaintiff's unlawful discrimination claims under ADA and FEHA together.

To establish a prima facie case of disability discrimination under the ADA, an employee must provide evidence that: (1) the employee suffered from a disability; (2) the employee could perform the essential duties of the job with or without reasonable accommodations; and (3) the employee was subjected to an adverse employment action because of the disability. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001); *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). The elements of a prima facie case of disability discrimination under FEHA are identical. *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

In its motion, Defendant argues that it is entitled to summary judgment on Plaintiff's unlawful discrimination claims because Plaintiff's claims under ADA and FEHA are based on the contention that Defendant failed to accommodate his disability. (*See* ECF No. 27-1 at 22–25.) Defendant argues that Plaintiff did not need an accommodation to perform the essential functions of his job within the meaning of the ADA or FEHA and if he did, the undisputed facts establish that Defendant provided every accommodation Plaintiff allegedly required. (ECF No. 27-1 at 23.) Defendant's arguments regarding reasonable accommodation will be addressed in detail in the following section.

It is undisputed that Plaintiff suffers from chronic renal failure. (ECF No. 27-1 at 10; ECF No. 27-10 at 2.) "Disability" under the ADA means: "(A) a physical . . . impairment that substantially limits one or more major life activities; (B) a record of such impairment; and (C)

being regarded as having such an impairment." 42 U.S.C. § 12102(1). The FEHA definition is broader insofar as it requires only that the disability "limit" a major life activity. Cal. Gov. Code. § 12926.1(c). Plaintiff suffers from renal disease, which substantially limits his renal functions in a manner sufficient to support life. (ECF No. 28-1 ¶¶ 176–78; ECF No. 28-12 at 3, ¶ 1–4; ECF No. 28-4 at 2, ¶P 3–4; ECF No. 28-13 at 2, ¶¶ 7–13.) Defendant does not dispute these facts. (*See, e.g.*, ECF Nos. 27-1 and 28-1.) Thus, the first prong of the unlawful discrimination test is satisfied.

Under the second prong of the unlawful discrimination test, it is undisputed that Plaintiff is otherwise qualified to do his job, i.e. could perform the essential duties of the job with or without reasonable accommodations. (ECF No. 28 at 20; ECF No. 27-1 at 22–23.) The essential duties of Plaintiff's job include selling tickets, assisting passengers with their baggage, and setting the priorities of the other clerks working on the shift when he was the lead. (ECF No. 27-1 at 9; ECF No. 28 at 20.) Although he needed to combine his work breaks so that he could have a one-hour break between 2:00 p.m. and 3:00 p.m. to attend to his peritoneal dialysis treatments, Plaintiff was able to perform the essential functions of his job after his rest breaks and meal period accommodation was granted. (ECF No. 27-1 at 14–15; ECF No. 28 at 20.) Thus, the second prong of the unlawful discrimination test is satisfied.

Under the third prong of the unlawful discrimination test, Plaintiff must show that there was both an adverse employment action and that the action was taken because of his disability. *See Snead*, 237 F.3d at 1089. It is undisputed that Defendant terminated Plaintiff. (ECF No. 28-1 ¶ 49.) An adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Davis v. Team Elec. Co.*, 520 F. 3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. U.C. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000)). Because Plaintiff's termination materially affects the compensation, terms, conditions, or privileges of employment, it is considered an adverse employment action. *See Snead*, 237 F.3d at 1089. Furthermore, Defendant does not contest that Plaintiff's termination was an adverse employment action. (*See, e.g.*, ECF No. 27-1 at 21–25.)

What is in dispute, however, is whether the termination was *because of* Plaintiff's

disability. (*See* ECF No. 27-1 at 22–26; ECF No. 28 at 20–21.) Defendant claims that the termination was not due to Plaintiff's disability but instead due to Plaintiff's refusal to allow the second shy bladder exam to go forward, which is a violation of the drug rehabilitation program that Plaintiff enrolled in and a requisite for his continued employment.[3] (ECF No. 27-1 at 14, 25.) However, Plaintiff contends, and has submitted sufficient evidence, that there is an issue of material fact regarding the events that occurred on October 14, 2014, the day of his second shy bladder exam.

According to his declaration, Plaintiff was concerned that if Dr. Friend did not follow certain sterilization procedures he would face reinfection, due to his history of peritonitis. (ECF No. 28-1 ¶ 226; ECF No. 28-4 ¶¶ 23–26.) Plaintiff also stated that he showed his catheter to Dr. Friend and told him his regular doctor had informed him that the catheter should be handled with gloves and a mask on. (ECF No. 28-1 ¶ 228; ECF No. 28-4 ¶ 26.) Plaintiff stated at this point, Dr. Friend terminated the exam by saying "I don't have to put up with this. . . ." (ECF No. 28-1 ¶ 229; ECF No. 28-4 ¶ 26.) Plaintiff further stated that he would have completed the shy bladder exam if Holland called Dr. Friend. (ECF No. 28 at 12; ECF No. 28-1 ¶ 235; ECF No. 28-4 ¶ 27; ECF No. 27-4 at 106–07.)

Defendant has submitted Dr. Friend's deposition in order to contradict Plaintiff's statements about what happened in the examination room. In his deposition, Dr. Friend states that Plaintiff never showed him his catheter or informed him about his peritoneal dialysis or end stage renal disease. (ECF No. 27-6 at 8.) However, undisputed evidence shows that Defendant was aware or should have been aware of Plaintiff's catheter and peritoneal dialysis. (ECF No. 28-1 ¶ 14; ECF No. 27-14 at 1; ECF No. 27-10 at 1–3.) For example, Defendant was in receipt of Plaintiff's Medical Status Report, in which Plaintiff's treating physician noted that Plaintiff had a peritoneal dialysis catheter inserted on August 9, 2013. (ECF No. 27-10 at 1.) Defendant was

---

[3] The Court declines to determine whether or not a shy bladder examination itself is an accommodation as a matter of law, required for an employee to perform the essential functions of their job. Defendant concedes that it was required to provide this accommodation to Plaintiff, and simply argues that the accommodation they provided was sufficient under the law. (*See* ECF No. 27-1 at 24 ("[I]t cannot be disputed that Amtrak accommodated Plaintiff's alleged inability to pro bladder examination . . . . This is a reasonable accommodation as a matter of law to address an individual's purported inability to provide a urine sample for a drug test.").)

14

also in possession of Plaintiff's Supplemental Physician's Statement of Disability, which stated that Plaintiff had acute and chronic renal failure and was on chronic peritoneal home dialysis. (ECF No. 27-14 at 1.)

"For purposes of the ADA, with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001) (citing *Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1086 (10th Cir. 1997)). "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." *Humphrey*, 239 F.3d at 1140; *see also Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2nd Cir. 1995) ("Failure to consider the possibility of reasonable accommodation for [known] disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities.").

Because Plaintiff has presented evidence that he would have completed the exam, an exam required for his continued employment, but for his concern about Dr. Friend handling the catheter, Plaintiff presented sufficient evidence demonstrating a triable issue of fact as to whether his failure to complete the shy bladder exam and related termination was caused by his renal disability. *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 875 (9th Cir. 1989) (finding a sufficient causal connection between the employee's disability and termination to show a prima facie case of disability discrimination where the employee was discharged for excessive absenteeism caused by migraine-related absences).

Plaintiff has presented a genuine dispute of material fact as to whether Defendant accommodated his disability. Accordingly, Defendant's motion for summary judgment on Plaintiff's unlawful discrimination claims under ADA and FEHA must be DENIED.

    C. <u>Reasonable Accommodation</u>

Under the second and fourth claims, failure to accommodate in violation of the ADA and FEHA, Plaintiff alleges Defendant failed to accommodate Plaintiff's physical impairment, failed to allow an alternate source of test material for drug/alcohol testing, and failed to engage in good

faith interactive process, resulting in loss of his employment. (*See* ECF No. 1 ¶¶ 32–34, 40–41.) Although Plaintiff brings his ADA and FEHA claims separately, the Court will analyze them together because California courts look to pertinent federal precedent when applying California statutes. *Guz*, 24 Cal. 4th at 354.

Defendant alleges that it is entitled to summary judgment on both claims because Plaintiff did not need an accommodation to perform the essential functions of his job within the meaning of the ADA or FEHA and even if he did, Defendant provided every accommodation Plaintiff allegedly required. (ECF No. 27-1 at 22–23.) However, the record shows that there is a factual dispute as to whether Defendant provided every accommodation Plaintiff allegedly required. As discussed above, Plaintiff has sufficient evidence that Defendant was aware of his catheter and peritoneal dialysis. (ECF No. 28-1 at ¶ 14; ECF No. 27-14 at 1; ECF No. 27-10 at 1–3.) Plaintiff has also submitted evidence that he would have completed the second shy bladder exam if Dr. Friend had agreed to take sanitary precautions with his catheter or continued the exam. (ECF No. 28 at 12; ECF No. 28-1 ¶ 235; ECF No. 28-4 ¶ 27; ECF No. 27-4 at 106–07.) Thus, a reasonable jury could infer that Defendant terminated Plaintiff due to Dr. Friend's refusal to complete the shy bladder exam and accommodate Plaintiff's disability. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) ("[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'").

Furthermore, as Defendant notes in its motion, the elements of a prima facie case for failure to accommodate are essentially identical to the elements of a prima facie case for discrimination. (ECF No. 27-1 at 21); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (holding that to state a prima facie claim for failure to accommodate under the ADA, a plaintiff must show that "(1) [he] is disabled within the meaning of the ADA; (2) [he] is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [he] suffered an adverse employment action because of [his] disability."); *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003) (same); *Nunes*, 164 F.3d at 1246 (same); *see also* 42 U.S.C. § 12112(a), (b)(5)(A) (requiring reasonable accommodation). Because Plaintiff has successfully established a prima facie case for discrimination, he has also

16

successfully established a prima facie case for failure to accommodate under the ADA. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 412 (2002) ("[D]iscrimination includes an employer's 'not making reasonable accommodations to the *known physical or mental limitations* of an otherwise qualified . . . [employee] . . . .") (quoting 42 U.S.C § 12112(b)(5)(A)). Moreover, the employer's duty to provide reasonable accommodation for an employee with a disability is broader under the FEHA than under the ADA, so Defendant's motion to dismiss Plaintiff's reasonable accommodation claim under FEHA necessarily fails. *See Bagatti v. Dept. of Rehab.*, 97 Cal. App. 4th 344, 362 (2002) ("[T]he duty of an employer to provide reasonable accommodation for an employee with a disability is broader under the FEHA than under the ADA."). Failure to engage in the interactive process, however, is a separate theory, and the Court will analyze it as such. *Swanson v. Morongo Unified Sch. Dist.*, 232 Cal. App. 4th 954, 971 (2014).

      *i.*     *Failure to Engage in the Interactive Process*

In *Humphry*, 239 F.3d at 1137–38, the court opined that:

> Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. An appropriate reasonable accommodation must be effective in enabling the employee to perform the duties of the position. he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process. [Employers], who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible.

Defendant does not address the failure to engage in the interactive process issue in its motion. Plaintiff claims that Defendant denied his request to take a blood test rather than a urine test and did not communicate that the shy bladder exam was considered a reasonable accommodation. (*See* ECF No. 28 at 25–26.) This is supported by Plaintiff's declaration, which states that on or about October 16, 2014, he asked his supervisor, Holland, if he could take a blood test to confirm that there were no drugs in his system and his request was denied. (ECF No. 28-4 at 5–6.) Defendant argues that allowing an individual to by-pass a drug test by taking a

17

shy bladder exam is a reasonable accommodation as a matter of law. (ECF No. 31 at 7.) However, the Ninth Circuit has held that determining whether a proposed accommodation is reasonable requires a fact-specific, individualized inquiry. *Nunes*, 164 F.3d at 1247 ("determining whether employer's policy of unpaid medical leave was a reasonable accommodation required a fact-specific, individualized inquiry").

Thus, Plaintiff has presented evidence to establish a genuine dispute of material fact as to whether Defendant failed to engage in the interactive process. *See Humphrey* 239 F.3d at 1139 (finding that employer failed to engage in the interactive process where employer denied employee's request without suggesting any alternative solutions, or exploring with her the possibility of other accommodations); *see also Dunlap v. Liberty Natural Prods., Inc.*, 878 F.3d 794, 799 (9th Cir. 2017) (finding that defendant failed to engage in the interactive process where the evidence reflected that defendant had prior notice of plaintiff's limitations, refused to consider or implement her proposed accommodations, and failed to articulate any undue hardship).

Accordingly, Defendant's motion for summary judgment on Plaintiff's reasonable accommodation and failure to engage in interactive process claims under ADA and FEHA is DENIED.

### D. Wrongful Termination in Violation of Public Policy

Plaintiff's fifth cause of action alleges that Defendant wrongfully terminated Plaintiff's employment because of his physical disability. (ECF No. 1 ¶ 43.) Plaintiff alleges discharging him in this manner was a violation of public policy against disability discrimination. (*See* ECF No. 28 at 27.)

To prove a claim for wrongful discharge in violation of public policy, Plaintiff must show: (1) Plaintiff was employed by Defendant; (2) Defendant discharged Plaintiff; (3) the alleged violation of public policy was a motivating reason for discharge; and (4) the discharge caused Plaintiff harm. *Haney v. Aramark Unif. Servs., Inc.*, 121 Cal. App. 4th 623, 641 (2004).

Neither party disputes that Plaintiff was employed by Defendant. (ECF No. 28-1 ¶ 1.) It is also undisputed that Defendant discharged Plaintiff. (ECF No. 28-1 ¶ 49.) Nor does Defendant contend that Plaintiff did not suffer any damages from his termination. (*See, e.g.*, ECF No. 28-1.)

The only point of contention is whether the alleged violations of public policy — in this case, the ADA and FEHA violations — were a motivating reason for discharge.

"In a non-mixed motive case . . . , a California wrongful termination claim in violation of public policy is analyzed under the three-prong burden-shifting framework from *McDonnell Douglas Corp.* . . . ." *Santillan v. USA Waste of Calif., Inc.*, 853 F.3d 1035, 1042 (9th Cir. 2017); *see also Earl*, 658 F.3d at 1112, 1118 (9th Cir. 2011) (applying burden shifting to wrongful termination claim based on violation of FEHA and public policy). "Under the first prong of the *McDonnell Douglas* framework, [the plaintiff] must establish a prima facie case under either an age discrimination or retaliation theory." *Santillan*, 853 F.3d at 1042. Under the second prong, the burden of production shifts to the defendant to rebut the presumption by producing admissible evidence that it had a legitimate nondiscriminatory reason for its adverse employment action. *Id*. If the defendant satisfies its burden, then, under the third prong, the plaintiff "must show that the reason advanced by [the defendant] constitutes mere pretext, or [the plaintiff] must produce other evidence of intentional discrimination." *Id*. "Finally, 'the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment.'" *Id*. (quoting *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008)).

As discussed above, Plaintiff has presented evidence to create a genuine dispute of material fact as to whether Defendant met its burden of establishing a legitimate, non-discriminatory business reason for Plaintiff's termination. Accordingly, Defendant's motion for summary judgment on Plaintiff's wrongful termination claim under ADA and FEHA is DENIED.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment, or, alternatively, Partial Summary Judgment, (ECF No. 27) is DENIED. The parties are hereby ordered to file a Joint Status Report within thirty (30) days of this Order indicating their readiness to proceed to trial and proposing trial dates.

///

///

19

IT IS SO ORDERED.

Dated: September 5, 2019

_____
Troy L. Nunley
United States District Judge